ANTHONY PRATA et al., Respondents, v NATIONAL RAILROAD PASSENGER CORPORATION, Also Known as AMTRAK, et al., Appellants, et al., Defendant.

First Department, September 20, 1979

**APPEARANCES OF COUNSEL**

*Edward F. Butler* of counsel *(Conboy, Hewitt, O'Brien & Boardman,* attorneys), for National Railroad Passenger Corporation, appellant.

*Lester E. Fetell (Sidney Cohen* with him on the briefs; *Levy, Bivona & Cohen,* attorneys), for Standard Railway Fusee Corporation, appellant.

*Steven E. Pegalis* of counsel *(Roger K. Solymosy* with him on the brief; *Pegalis & Wachsman,* attorneys), for respondents.

**OPINION OF THE COURT**

LYNCH, J.

The plaintiff Anthony Prata, an employee of the defendant Amtrak, had his right hand blown off by a railroad torpedo. A railroad torpedo is a coated brown paper package, two inches square and a half inch thick, with a strip of metal running through it to hold it in place on a railroad track. The package contains an explosive charge of chemicals and sand. When it is affixed to a track it is detonated—in a sense, ignited—by the weight of the train mixing the sand with the chemicals. The explosion sounds a warning of trouble ahead to the engineer.

Prata and his wife brought suit against his employer under

the Federal Employers' Liability Act (FELA) (US Code, tit 45, §§ 51-60) and against the defendant Standard Railway Fusee Corporation (Standard), the alleged manufacturer of the torpedo. The defendants appeal a judgment after a jury trial awarding $1,250,000 to Anthony Prata, apportioned 80% against Amtrak and 20% against Standard, and awarding $250,000 to Linda Prata for loss of consortium solely against Standard.

The accident occurred at Amtrak's engine house where Prata worked as a machinist. He testified that he saw a torpedo lying on a workbench, and, since it did not belong there, he picked it up to put it where it did belong. He said that when he picked it up it exploded.

In the hospital two and a half hours later Prata told a railroad policeman that the torpedo had exploded when he had attempted to remove "the metal center". From this and the presence of blood on a vise attached to the workbench, Amtrak theorized at the trial that Prata had placed the torpedo in the vise and its closing pressure had caused the explosion. The jury, however, was free to reject this hypothesis and evidently did by crediting testimony that Prata was heavily sedated at the time of his hospital statement, that there were bits of flesh and blood all over the place and that Prata's injury was not compatible with an explosion emanating from the vise.

The dissent would hold that the complaint should be dismissed from the plaintiffs' failure to make a prima facie case in that that was not even "circumstantial evidence tending to establish that the encapsulation of the torpedo was worn". We cannot agree. Nor can we agree with Amtrak's assertion that the verdict against it should have been set aside as against the weight of the evidence.

■ Conceding that the only way the torpedo could have exploded in the manner related by Prata were if "the integrity of the package [had been] compromised", we find circumstantial evidence from which a jury could conclude such a compromise in the following testimony: that railroad torpedoes—Class B explosives—should remain stored in their original shipping cartons until needed, that their only handling should be to be taken out of the carton, carried to the desired site, and affixed to the rail; that, because of the risk of damage to it, a torpedo should never be left on a workbench; that, contrary to this standard in Amtrak's operations torpedoes

were left strewn about railroad yards, were found in the vestibules of passenger cars, kept on counters, exposed to the elements and even used as tie-downs for train controls; that prior to the accident Prata's foreman saw torpedoes in a bin by the workbench, that he knew they did not belong there but did nothing about it. "Ordinarily, proximate cause is a question of fact in explosion cases" (22 NY Jur, Explosions and Explosives, § 32; see, also, *Lomoriello v Tibbets Contr. Corp.,* 18 AD2d 911, affd 13 NY2d 736; *Bucciarelli v Rinehart & Dennis Co.,* 172 App Div 968; 5B Warren's Negligence, Explosives, § 1.08).

■■■ "One who keeps an explosive substance is 'bound to the exercise of a high degree of care to so keep it as to prevent injury to others.' *(Travell v. Bannerman,* 174 NY 47, 51.) The degree of care required is commensurate with the risk involved, depending upon such circumstances as the 'dangerous character of the material' and its accessibility to others" *(Kingsland v Erie County Agric. Soc.,* 298 NY 409, 423). In FELA cases "the inquiry * * * rarely presents more than a single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit" *(Rogers v Missouri Pacific R. R. Co.,* 352 US 500, 508). Added to the circumstantial evidence that the integrity of the packaging of the torpedo had been compromised there was other testimony from which the jury could conclude properly that Amtrak's negligence had played a part in these injuries. It had no procedure for inspecting torpedoes to determine if they were frayed, worn, damaged or defective. Neither Prata nor his fellow machinists had been instructed how torpedoes should be handled. The only rule promulgated by Amtrak was that torpedoes should not be thrown into open fires. Amtrak's assertion is unavailing that it had no notice that a defective torpedo would explode under handling like that given it by Prata. Under FELA, negligence attaches if the defendant ought to have known "that prevalent standards of conduct were inadequate" *(Urie v Thompson,* 337 US 163, 178).

Amtrak has also raised on appeal a number of objections to the trial court's admission or exclusion of evidence and alleged errors in its charge. We have examined each of these points and find that those that are technically meritorious were not prejudicial or were influential only on the amount of damages, an issue treated herein.

■ Contrary to the defendant Standard's assertion, the jury could properly determine that it had manufactured the culprit torpedo and shared in the liability to the plaintiffs. On the question of the identity of the manufacturer the following testimony was available to the jury: that Standard manufactured railroad torpedoes and Amtrak was one of its torpedo customers; that, to the best of the knowledge of Standard's sales manager, other companies did not sell torpedoes to Amtrak; that, most significantly, two remnants of a torpedo metal fastening found at the site of the explosion were identical in analysis to that of Standard's torpedoes. This evidence provided a rational basis for the jury's determination (see *Cohen v Hallmark Cards,* 45 NY2d 493, 499).

■ A manufacturer of a dangerous product is under a duty to exercise reasonable care to give warning of the risks inherent in the abuse or misuse of the product *(Tucci v Bossert,* 53 AD2d 291, 293). The proof here established that Standard had not issued any warnings of the danger of these torpedoes when not properly encapsulated or handled and the jury was entitled to find Standard liable for its failure to make information available about the foreseeable risk arising from inadequate storage or mishandling *(Howard Stores Corp. v Pope,* 1 NY2d 110).

The dissent would excuse this failure to warn or instruct on the authority of *Littlehale v Du Pont de Nemours & Co.* (268 F Supp 791), because delivery was to a sophisticated user. In that action the plaintiff was injured by the explosion of blasting caps manufactured by the defendant and delivered without warning instructions to United States Army ordinance. There, unlike the instant case, the blasting caps were manufactured according to the customer's specifications and the court expressly held that the case was distinctive because the specifications did not require warnings and because army ordinance was expert in the use, handling and storage of explosives, such as blasting caps. There was no proof here that the torpedoes were made to Amtrak's specifications, that Amtrak possessed any special knowledge of explosives, and from the proof a jury could conclude that it was most inexpert in the handling and storage of its torpedoes.

■ Standard also contends that the trial court erred in holding that Linda Prata's claim from loss of consortium was cognizable only against it and not against Amtrak. It does not appear that Standard objected to this ruling but had it been

preserved for appeal (see CPLR 5501, subd [a], par 3) we could not deem it error.

It has long been recognized that a railroad's liability in FELA cases is circumscribed by the specific language of that act *(New York Cent. & Hudson Riv. R. R. Co. v Tonsellito,* 244 US 360) which contains no provision for loss of consortium. Standard attacks the continued vitality of this holding on the basis of a number of recent cases: *Sea-Land Servs. v Gaudet* (414 US 573); *Moragne v States Marine Lines* (398 US 375); *Igneri v Cie de Transports Oceaniques* (323 F2d 257); *Alvez v American Export Lines* (46 NY2d 634).

Standard argues that these cases, admittedly all in the field of maritime law, should be applied to railroad cases under FELA because the rights of mariners flow directly from FELA by its incorporation by reference into the Jones Act (US Code, tit 46, § 688). Examination of these decisions discloses, however, that they do not represent an enlargement of a statutory remedy, Jones Act or FELA, but an evolution of the common-law-like maritime law of torts apart from these statutes. Thus they cannot bear here on any rights cognizable under FELA. Absent any judicial direction or legislative intent to expand the statutory remedy, the established decisions precluding recovery for loss of consortium must be controlling (see, for example, *Spinola v New York Cent. R. R.,* 33 AD2d 74).

■ Finally, we hold that the verdicts are excessive to the extent hereinafter indicated. The plaintiffs proved no special damages. All the hospital and medical bills have been paid by Amtrak. Excluding overtime the injured plaintiff's salary was $289 a week. Although he still has some pain, he has been fitted with a prosthesis, is employable and has a work life expectancy of thirty-five years. There is no proof to justify the awards that were made.

The judgment of the Supreme Court, New York County, entered October 5, 1978, which awarded plaintiff Anthony Prata $1,250,000 against defendants Amtrak (80%) and Standards (20%), and awarded plaintiff Linda Prata $250,000 against defendant Standard, should be reversed, on the law and the facts, and a new trial ordered on the issue of damages, with costs to abide the event, unless Anthony Prata stipulates to accept $700,000 (apportioned 80% against Amtrak and 20% against Standard) and Linda Prata, $50,000, and if so stipualted the judgment is affirmed without costs or disbursements.

MURPHY, P. J. (dissenting). Plaintiff Anthony Prata (Prata), a machinist for Amtrak, lost his right hand when a "railroad torpedo" exploded on June 10, 1976. A torpedo is a compact explosive device that is generally placed on top of a rail. The force and weight of the locomotive traveling over the torpedo causes it to explode. The noise of the explosion alerts the engineer that there is danger ahead. At trial, Prata maintained that the torpedo exploded a few moments after he lifted it off a workbench. However, shortly after the occurrence, Prata told railroad police officer Finan that he was attempting to remove the metal center from the torpedo when it exploded. Defendant Amtrak hypothesized that Prata had placed the torpedo in the vise to remove the center and that the pressure of the vise had caused the torpedo to explode.

The parties' experts agreed that railroad torpedoes were constructed to specifications that would withstand normal handling. Standard's manager, Rosak, testified that in his 40 years of experience no torpedo ever exploded while being handled in the process of manufacture. Plaintiffs' expert, Melvin Cook, did testify that a torpedo could explode under the situation described by Prata. Cook theorized that the torpedo might explode under normal handling if the encapsulation was so worn and frayed that the powder was exposed to sand or another abrasive. Cook further opined that the torpedo could have exploded even if the encapsulation were not worn. He stated that the torpedo could have exploded if it contained sand and the holder "pinched" it. The record contains evidence that Amtrak misused and abused the torpedoes delivered to it. Plaintiffs' primary contention was that the subject torpedo exploded as a result of misuse and abuse at the hands of Amtrak.

The plaintiffs sought recovery from Amtrak for its negligence, *inter alia,* in failing to provide Prata with a safe place to work and failing to give him adequate warning instructions concerning the dangers of this explosive device. Recovery was sought against Standard, the manufacturer of the device, on the theories of strict product liability and failure to warn. (See generally, 80 ALR2d 488, Liability of manufacturer or seller for injury caused by firearms, explosives and flammables, § 33.)

The doctrine of *res ipsa loquitur* is not controlling on the facts in this proceeding. The mere happening of an explosion carries with it no presumption of negligence. It is an affirma-

tive fact for the injured party to establish that the party sought to be charged with liability has been guilty of negligence (*Du Pont de Nemours Powder Co. v Duboise*, 236 F 269, 691). Prata testified that he merely picked the torpedo off the workbench. He averred that he did not study the torpedo before he picked it up nor did he pay particular attention to it during the few moments he was holding it before the explosion. However, Prata did state that the subject torpedo looked "similar" to the others he had observed around the railroad yard.

Since there is no indication in the record that Prata "pinched" or placed extraordinary hand pressure on the torpedo in picking it up, the explosion could only have occurred, according to the expert testimony, if the encapsulation was worn. At trial, Prata was required to come forward with, at least, circumstantial evidence tending to establish that the encapsulation of the torpedo was worn. In contravention of his evidentiary burden, Prata did not state that the encapsulation of the torpedo was worn; he asserted that the torpedo appeared "similar" to others that he had seen. Parenthetically, it should be stressed that Prata had worked with torpedoes during his employment with Amtrak. Neither he nor his fellow employees testified that they had ever seen the encapsulation of any torpedo to be worn or frayed. There was no testimony from any witness at trial that a torpedo had actually exploded under circumstances described by Prata.

The plaintiffs' entire case was thus based upon the mere speculation that the encapsulation had become worn as a consequence of Amtrak's over-all negligence in handling and storing the torpedoes. According to plaintiffs' version of the occurrence, the subject torpedo was found on the workbench. An unidentified individual, presumably a fellow employee, purportedly placed it there. The record is devoid of any explanation as to why that unidentified individual was able to handle the torpedo without incident if it were then in a dangerously frayed condition. Furthermore, there is no reason to assume, suspect or believe that the subject torpedo became frayed during the period it rested on the workbench. Plaintiffs' case is fatally deficient insofar as it did not demonstrate that Amtrak's over-all negligence proximately caused the encapsulation of this torpedo to become frayed. In fact, plaintiffs did not adduce any evidence that this torpedo was frayed. Liability should not be promulgated against Amtrak upon

"pure guesswork" by the trier of fact. *(Du Pont de Nemours Powder Co. v Duboise, supra,* at p 693.)

There are other reasons for dismissing the proceeding as against Standard. In order to show that a product was negligently manufactured, an injured party must demonstrate that the product was defective when it left the hands of the manufacturer *(Clay v Ensign-Bickford Co.,* 307 F Supp 288, 291). Plaintiffs did not show that the subject torpedo or any other torpedo in Amtrak's inventory was defectively manufactured. Moreover, as plaintiffs' counsel conceded in his summation, the torpedo under discussion had been in Amtrak's inventory for over four years. Since the torpedo had not been in Standard's possession or control for over four years, plaintiffs were required to demonstrate that the torpedo had not been damaged during that period by Amtrak before they could hold Standard liable. *(Du Pont de Nemours Powder Co. v Duboise, supra,* at p 693.)

It should be further stressed that railroad torpedoes were manufactured to specifications prepared by the Bureau of Explosives of the Associaton of American Railroads. Since Standard had reason to believe that it was delivering the torpedoes to a sophisticated user, it cannot be held accountable for failure to warn either Amtrak or Prata. *(Littlehale v De Point de Nemours Co.,* 268 F Supp 791, affd 380 F2d 274.)

Accordingly, the judgment of the Supreme Court, New York County, entered October 5, 1978, which awarded plaintiff Anthony Prata $1,250,000 against defendants Amtrak (80%) and Standard (20%), and awarded plaintiff Linda Prata $250,-000 against defendant Standard, should be reversed, on the law, and the complaint should be dismissed.

KUPFERMAN, FEIN and LANE, JJ., concur with LYNCH, J.; MURPHY, P. J., dissents in an opinion.

Judgment, Supreme Court, New York County, entered on October 5, 1978, reversed, on the law and the facts, and a new trial directed on the issue of damages, with $75 costs and disbursements of this appeal to abide the event, unless Anthony Prata stipulates to accept $700,000 (apportioned 80% against Amtrak and 20% against Standard) and Linda Prata, $50,000, and if so stipulated the judgment is affirmed, without costs and without disbursements.