**Todd Alan KOERNER, Plaintiff,**

v.

**CLUB MEDITERRANEE, S.A., Club Med (Bahamas) Ltd., Club Med Sales, Inc., Club Med Management Services, Inc., Defendants.**

No. 90 Civ. 6642 (RWS).

United States District Court,
S.D. New York.

Sept. 21, 1993.

Tate & Bywater, Ltd., Vienna, VA (David R. Axelson, of counsel), Thomas Koerner, Fairfax, VA, for plaintiff.

Proskauer Rose Goetz & Mendelsohn, New York City (Bettina B. Plevan, Jay I. Sabin, Joy Axelrad, Stephen Keyes, of counsel), for defendant.

## *OPINION*

SWEET, District Judge.

This action between plaintiff Todd Alan Koerner ("Koerner") and defendant Club Med (Bahamas), Ltd. ("Club Med"), the only defendant remaining at trial, was tried before a jury from April 7 to April 13, 1993. On April 13, 1993, the jury returned a verdict for Koerner.

Club Med moved pursuant to Rule 50(b), Fed.R.Civ.P., for a judgment as a matter of law or, in the alternative, for a new trial pursuant to Rule 59, Fed.R.Civ.P. Club Med also has moved for remittitur of the damages awarded as an alternative to a new trial on all issues.

Koerner has moved pursuant to Rule 15(b), Fed.R.Civ.P., for leave to increase his *ad damnum* to conform to the proof at trial and for judgment on the jury's verdict.

Oral argument was heard on April 21, 1993, and the motions were considered submitted as of that date.

For the reasons set forth below, Club Med's Rule 50(b) motion is denied, its Rule 59 motion is granted, and Koerner's Rule 15(b) motion is denied.

### *Parties*

Koerner is a natural person who is domiciled in the Commonwealth of Virginia.

Club Med is a wholly owned subsidiary of Club Mediterranee, S.A., and is a corporation duly organized and existing under the laws of the Bahamas. It operates the Club Med Turkoise resort facility (the "Turkoise Resort") located in the Turks and Caicos Islands in the British West Indies.

### *Prior Proceedings and Facts*

On October 15, 1992, Koerner brought this diversity action against Club Med, alleging personal injuries as a result of a boating accident which occurred during the course of his employment with Club Med. Koerner proceeded to trial on the theory that Club Med owed him a duty to train him properly to operate the equipment safely in the conditions he was reasonably likely to meet in the performance of his required duties.

Koerner alleged that he received no training from Club Med in the use of a 17' outboard motor boat, a Boston Whaler (the "Boston Whaler"), which he was assigned to operate in the course of his work as a windsurfing instructor off the shore of the Club Med resort. According to Koerner's proofs, as a result of Club Med's failure to train him in the proper operation of the Boston Whaler, he failed to appreciate and avoid certain dangerous surf conditions that developed on October 14, 1987.

Koerner provided expert testimony from Thomas Ebro ("Ebro") to the effect that the approach taken by Club Med to train and supervise its employees failed to meet the standard of care in the resort industry for training persons who would be required to utilize motor boats to retrieve and rescue patrons of the resort from the ocean.

On the date in question, Koerner had been piloting the Boston Whaler to shuttle Club Med patrons from a larger boat to the dock. After the shuttling process was completed and while Koerner was bringing the Boston Whaler to shore, he noticed that a Club Med patron who had been windsurfing was in the water with the sail down.

Koerner threw the windsurfer a line and towed him toward to shore. Koerner then brought the Boston Whaler into shallow water parallel to the beach, shut off the engine, moved to the aft section of the Boston Whaler, and began lifting the engine out of the water to secure the boat. As Koerner lifted the engine into the boat, a large wave capsized the boat upon the beach. Koerner was thrown out of the Boston Whaler as it turned over, and the boat landed on him, trapping him beneath it and pinning his right hand beneath the gunwale.

As a result of this accident, Koerner suffered three broken bones in his right hand and the skin on the back of the hand was "degloved." Koerner underwent six surgical procedures to repair these injuries, including

the use of a "groin flap" procedure to graft skin from his lower abdomen onto the hand.

Koerner has suffered a 40% permanent partial disability to his right dominant hand, which has limited his ability to participate in sports and eliminated his ability to play the trumpet, a 10% permanent partial disability to his whole body as a consequence of the skin graft, and the psychological trauma of his disfigurement.

### Discussion

#### I. Club Med's Rule 50(b) Motion Is Denied

##### A. The Standard For Rule 50

■ A motion for judgment as a matter of law should be denied unless, viewed in the light most favorable to the nonmoving party, "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as the verdict that reasonable men could have reached." *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)); *accord Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988); *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 889 (2d Cir.1988).

■ There must be "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Samuels*, 992 F.2d at 14; *see also Mattivi v. South African Marine Corp., "Huguenot,"* 618 F.2d 163, 168 (2d Cir.1980). However, the court " 'cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.' " *Smith*, 861 F.2d at 367 (quoting *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir.1987)); *see also Mattivi*, 618 F.2d at 167.

#### B. Applying The Standard To Koerner's Proofs

■ The gravamen of Koerner's action was that Club Med's negligence proximately caused his injury. In order to establish a claim for negligence, a plaintiff must estab-lish the following familiar elements: first, that the defendant owed him a duty; second, that the defendant breached that duty; third, that the injury to the plaintiff was foreseeable; and fourth, that damages incurred by the plaintiff were proximately caused by the defendant's breach. *See Sinclair v. Long Island R.R.*, 985 F.2d 74, 77 (2d Cir.1993).

■ A review of the trial record fails to support the conclusion that the "jury's findings could only have been the result of sheer surmise and conjecture." *Samuels*, 992 F.2d at 14. Koerner's proofs included evidence intended to establish each of the elements of his negligence claim. With regard to the existence of a duty owed by Club Med to him to train him in the proper use of the Boston Whaler, Koerner offered into evidence his employment contract (the "Contract") with Club Med and the testimony of his liability expert, Ebro.

The Contract between Koerner and Club Med explicitly stated that Koerner would be "subject to instruction, direction and control," indicating that Club Med recognized a duty it owed him to provide him with the necessary training to safely perform the tasks that would be assigned to him. Ebro amplified these terms of the Contract in his testimony regarding the standard of care in the ocean-front resort industry to provide water-front workers with training in the use of equipment such as the Boston Whaler.

The record also contains sufficient evidence regarding Club Med's breach of that duty. Koerner testified regarding the limited training he had received in the operation of the Boston Whaler. Sylvia Krainen corroborated Koerner's testimony about the lack of training at the Turkoise Resort. Evidence was also presented on this issue in the form of information about the lack of staff meetings at the Turkoise Resort and Koerner's performance evaluations, which ignored the subject of training and qualifications.

Koerner's proofs also contained evidence regarding Club Med's knowledge of the manner in which the Boston Whaler was being used by him and others. Club Med management at the Turkoise Resort was aware of how windsurfing rescues were being per-

formed, and there was evidence supporting Koerner's claim that Club Med was aware of the possibility of the dangerous surf conditions similar to those that developed on October 14, 1987. Testimony was presented that similar water conditions had developed at various times during the five months of Koerner's employment prior to the accident and that Koerner had not previously operated the Boston Whaler under the kind of conditions that arose on the day in question.

According to Koerner's proofs, as a result of Club Med's breach of its duty to instruct him in the proper use of the Boston Whaler in performing his job under the conditions of October 14, 1987, Koerner sustained the aforementioned injury to his hand and was required to undergo the numerous procedures to repair it.

When Koerner's proofs are considered on their face, and they are not subjected to an analysis of the weight of Koerner's evidence or the credibility of the testimony Ebro and Koerner's other witnesses, *see Smith*, 861 F.2d at 367; *Katara*, 835 F.2d at 970; *Mattivi*, 618 F.2d at 167, the proofs and the record of this motion sufficiently support the jury's finding that Club Med owed Koerner a duty to train him in the proper use of the Boston Whaler, that Club Med breached that duty by failing to train him, and that Koerner's injuries were proximately caused by that breach. Therefore, Club Med's Rule 50(b) motion must be denied.

## II. *Club Med's Rule 59 Motion For A New Trial Is Granted*

Club Med has moved for a new trial on the issues of negligence and damages. In light of the trial record, Club Med is entitled to a new trial on both issues.

### A. *Club Med's Motion Is Entitled To A New Trial On The Issue Of Negligence*

#### 1. *The Standard For Rule 59(a)*

Rule 59(a) empowers a district court to set aside a jury verdict and order a new trial "for any reason of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. Rule 59(a)(1).

A motion for a new trial should be granted whenever "the verdict is against the weight of the evidence," *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir.1983) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940)), and in assessing the weight of the evidence, "[t]he trial judge is free to weight the evidence himself and need not view it in the light most favorable to the verdict winner," *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978) (citation omitted). Even when there is substantial evidence to support a jury verdict, a new trial may be warranted. *See id.* at 683.

The Second Circuit has set forth the criteria to be employed by the district court in deciding a Rule 59 motion as follows:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

*Id.* at 684.

#### 2. *Applying The Standard To The Trial Record*

At trial, the jury was instructed on the concept of contributory negligence and Club Med's use of it as a defense as follows:

> "Contributory negligence" is fault on the part of a person injured, which cooperates in some degree with the negligence of another, and so helps to bring about the injury.
>
> \* \* \* \* \* \*
>
> If any negligence by Koerner played any part, even the slightest, in causing his injury, then you must find that he was contributorily negligent. Contributory negligence

has been defined as the failure to use due care for one's own safety—that is, the care that a reasonably prudent person would have exercised under the circumstances. Every person, Koerner included, has a legal duty to make reasonable use of his own senses in order to avoid injury to himself, and failure to do so is contributory negligence as a matter of law. A reasonable person exercises due care with respect to his work place and working methods and may not act in disregard of his own safety.

Club Med contends that Koerner was contributorily negligent because alternative courses of action were available to him and he chose the course of action that a reasonable person, with like experience and exercising due care, would not have chosen.

Jury Charge at 8–9.

■ In answer to Question 4 on the Special Verdict Form, the jury found that no percentage of negligence was attributable to Koerner.[1] An analysis of the trial record supports Club Med's contention that the jury ignored this instruction and that its finding on the issue of contributory negligence was clearly against the weight of the evidence and testimony which had been presented to them. The juror's finding on this issue constituted a clear and serious error warranting a new trial. *See Akermanis v. Sea–Land Serv., Inc.,* 521 F.Supp. 44, 51 (S.D.N.Y.1981) (holding jury's contributory negligence allocation of only 4% to plaintiff was seriously erroneous and warranted a new trial), *rev'd on other grounds,* 688 F.2d 898, 905 (2d Cir.1982) (*Akermanis II* ), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983).

■ In evaluating whether Koerner was contributorily negligent, it is necessary to focus on "what choices were available to [him] and how he exercised those choices." *Akermanis II,* 688 F.2d at 904 n. 2); *accord*

*Burden v. Evansville Materials, Inc.,* 840 F.2d 343, 347 (6th Cir.1988) (affirming district court's assessment of plaintiff's contributory negligence based upon plaintiff's performance of "work in an improper and unsafe method when a safe alternative was available to him").

The trial record established that Koerner was contributorily negligent in causing the accident. First, if, as Koerner contends, he had insufficient training to handle the surf conditions on October 14, 1987, he acted negligently in undertaking the operation of rescuing the windsurfer on his own. The evidence indicated that the windsurfer was not in perilous condition, and Koerner could have sought guidance and instruction about what to do in the face of his alleged lack of experience with rough water conditions.

Koerner acted negligently in not bringing the stranded windsurfer into the Boston Whaler during the retrieval operation. Koerner acknowledged that he knew that it was much easier to have someone in a boat than to tow them to shore in rough waters and that he had placed guests in the Boston Whaler during previous retrievals. He offered no explanation regarding his failure to follow this procedure in this situation.

Koerner's failure to bring the windsurfer into the Boston Whaler unnecessarily complicated the retrieval procedure. If the windsurfer had been in the boat, Koerner could have taken him to the pier and safely discharged him there. Thus, instead of considering his own safety in piloting the Boston Whaler into the shore, Koerner placed himself in a situation where he was forced to concentrate on the windsurfer in tow. *See Akermanis II,* 688 F.2d at 905 (because plaintiff was concentrating on his work instead of on his own safety the jury found him contributorily negligent). As a result of the distracted manner in which Koerner piloted the boat, which itself was directly caused by

---

1. Question 4 of the Special Verdict Form asked the jury:

4. What was the percentage attributable to the negligence of Club Med (Bahamas) and Koerner?

Club Med _____%

Koerner _____%

= 100 %.

The jury crossed out the question without filling in either blank.

choices he made in the process of retrieving the windsurfer, the accident occurred and Koerner was injured.

Koerner also acted negligently by failing to drop anchor as he approached the shore. Again, this resulted, at least in part, from his being distracted by the windsurfer in tow. Dropping anchor is a frequently used and commonsensical practice to keep the boat at a safe distance from the shore. Koerner's only explanation of his failure to take this precautionary measure was that it did not occur to him to use either the anchor or buoys to secure the Boston Whaler while retrieving the windsurfer.

Moreover, Koerner was negligent in ignoring the standard towing procedure as he approached the beach. Koerner acknowledged that he knew the standard procedure for retrieving stray windsurfers, that the procedure was "kind of self-evidence," Trial Tr. at 98, and that detailed instruction regarding the procedure was given during a meeting of the waterfront workers and supervisors attended by Koerner. In fact, Koerner testified that he had successfully executed approximately 400 retrievals prior to the accident, and he admitted at trial that, in the course of events leading up to the accident on October 14, 1987, he ignored this standard procedure with which he was quite familiar. Despite his familiarity with these procedures, Koerner made a conscious decision to "let the boat ground and then deal with the grounding of the boat later." Trial Tr. at 117. Therefore, in light of the procedures he had followed in the past, Koerner admitted that he erred in maneuvering the Boston Whaler immediately prior to the accident. In surf and shallow water, standing up to lift the motor, thereby raising the center of gravity of the Boston Whaler, was also negligent.

The trial record indicates that Koerner knew the proper retrieval procedures, that he ignored them on October 14, 1987, and that several decisions he made directly contributed to the accident and his injury. If he had followed the procedures and kept the boat at a safe distance from the shore, or if he had transferred the windsurfer to the pier after having him board the Boston Whaler, the accident would not have happened. Therefore, the jury finding of no contributory negligence was clearly erroneous and against the weight of the evidence. Club Med is entitled to a new trial on the issue of negligence, and its Rule 59 motion is granted.

### B. *Club Med Is Entitled To A New Trial On Damages*

The jury awarded Koerner $2,500,000 in damages for his past actual physical and mental pain and suffering, and $2,500,000 in future damages for his physical and mental pain and suffering. Koerner did not claim future damages for lost earnings. In light of the evidence presented at trial, this award is so excessive that it is "shocking to the 'judicial conscience,'" *Donovan v. Penn Shipping Co.*, 536 F.2d 536, 539 (2d Cir.1976), *aff'd per curiam*, 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977), and considerations of justice and fairness dictate that it be set aside and that Club Med is entitled to a new trial on the issue of damages.

#### 1. *The Standard For Assessing The Appropriateness Of A Jury's Award*

A motion for a new trial should be granted when a jury's award of damages, in light of the evidence, is so unreasonable that it would be unconscionable to allow it to stand. It is well-settled that a judgment in the Second Circuit cannot be upheld when the damages awarded are so excessive that "they shock the judicial conscience and constitute a denial of justice." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir.1990); *accord Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1327 (2d Cir.1990); *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir.1988); *Martell v. Boardwalk Enter., Inc.*, 748 F.2d 740, 752 (2d Cir.1984); *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir.1978); *United States ex rel. Larkins v. Oswald*, 510 F.2d 583, 589 (2d Cir.1975).[2]

---

**2.** In 1986, an amendment to N.Y.Civ.Prac.L. & R. § 5501(c) replaced the "shocks the judicial conscience" standard for review of damage awards by the New York State Appellate Division courts with the test that "an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." While the Second Circuit has yet to decide which standard

The Second Circuit has indicated that, in determining whether an award is excessive, the court should undertake a comparative evaluation of jury awards because:

Jury verdicts and judicial opinions approving or disapproving them, when considered over a period of time, provided some indication of the consensus of opinion of jurors and courts as to the proper relation between the character of the injury and the amount of compensation to be awarded.

*Martell*, 748 F.2d at 750 (citation and quotation marks omitted).

 Awards in comparable cases may be used as a point of reference by which to measure the appropriateness of a challenged award, *see Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1058 (2d Cir.1990); *Matthews v. CTI Container Transp. Int'l, Inc.*, 871 F.2d 270, 278 (2d Cir.1989); *Slade v. Whitco Corp.*, 810 F.Supp. 396, 399–400 (N.D.N.Y. 1993), and in evaluating whether the award in a particular case is "shocking to the judicial conscience," a court should consider verdicts in the jurisdiction whose substantive law is applicable, *see Raucci*, 902 F.2d at 1058.

### 2. *Applying The Standard To The Jury's Award*

 In assessing the reasonableness of the jury's award of $5,000,000, Club Med suggests that this Court should look to awards in comparable actions that have been decided under the law of Turks and Caicos. While the parties agreed that the law of Turks and Caicos was controlling in this action, the Court declines this invitation and finds it more appropriate to look to the awards of juries in the State of New York to accurately assess the reasonableness of this award. A review of jury awards in this State for injuries similar to those sustained by Koerner establishes that the damages Koer-

ner was awarded were grossly excessive to the point of shocking the judicial conscience of this Court.

Club Med has conducted an exhaustive survey of damages awarded by New York juries in actions involving comparable hand injuries. A review of 23 verdicts fitting the injury profile reveals an award range from $30,000 to $800,000, with only two of the verdicts exceeding $500,000.[3]

In addition to these verdicts, New York courts have found unreasonably excessive awards to plaintiffs suffering hand injuries which are substantially less than the $5,000,000 awarded to Koerner: $1,500,000 for degloving of skin on and compound fracture of arm and deep crushing of muscles, *see Flynn v. Manhattan & Bronx Surface Transit Operating Auth.*, 94 A.D.2d 617, 462 N.Y.S.2d 17 (1st Dep't 1983), *aff'd*, 61 N.Y.S.2d 769, 473 N.Y.S.2d 154, 461 N.E.2d 291 (1984); $1,200,000 for severely fractured elbow causing permanent impairment of arm, *see Berry v. Jewish Bd. of Family & Children's Serv.*, 173 A.D.2d 670, 570 N.Y.S.2d 586 (2d Dep't 1991); $1,250,000 for hand blown completely off by explosive warning device used in employer's railroad yard, *see Prata v. National R.R. Passenger Corp.*, 70 A.D.2d 114, 420 N.Y.S.2d 276 (1st Dep't 1979); $800,000 for permanent impairment of hand and leg, *see Osborne v. Miller*, 38 A.D.2d 298, 328 N.Y.S.2d 769 (1st Dep't 1972).

Finally, the following summary constitutes a representative sampling of jury verdicts in which the amount awarded was no more than $500,000 for past and future pain and suffering for injuries substantially more significant than those suffered by Koerner, to wit, actions arising from the amputation or complete impairment of fingers and hands: $420,000 for traumatic amputation of hand, *see Brown v. State of New York*, 184 A.D.2d

---

applies to federal diversity actions, it has been held that the standards do not conflict in these actions. *See In re Joint E. & S. Dist. Asbestos Litig.*, 798 F.Supp. 925, 937 (E. & S.D.N.Y.1992), *rev'd on other grounds*, 995 F.2d 343, 346 (2d Cir.1993). In the matter at hand, any distinction between the two standards is irrelevant because "[u]nder either standard, the award is excessive and has to be reduced, and the amount by which it is reduced would be the same under either

standard." *Datskow v. Teledyne Continental Motors Aircraft Prods.*, 826 F.Supp. 677, 690 (W.D.N.Y.1993).

**3.** The awards discussed here and below have been neither discounted to present value nor adjusted for inflation, and they do not reflect any reduction based on contributory negligence.

126, 592 N.Y.S.2d 533 (4th Dep't 1992); $400,000 for an injury leaving the plaintiff's arm withered and useless, *see Terry v. State of New York,* 79 A.D.2d 1069, 435 N.Y.S.2d 389 (3d Dep't 1981); $250,000 for traumatic amputation of infant plaintiff's arm, *see Figueroa v. New York City Transit Auth.,* 152 Misc.2d 948, 579 N.Y.S.2d 831 (Sup.Ct.Kings County 1991); $100,000 for amputated thumbs, *see Saleh v. State of New York,* 140 A.D.2d 966, 529 N.Y.S.2d 641 (4th Dep't 1988); $62,000 for crushed hand and amputated fingers, *see Ferry v. Luther Mfg. Co.,* 56 A.D.2d 703, 392 N.Y.S.2d 521 (4th Dep't 1977); $300,000 for a traumatic amputation of fingers, *see Yeasi v. Seaboard Folding Box Co.,* No. 18835/86 (Sup.Ct.Kings County Apr. 1991) (LRP Pub. No. 73605); $275,000 for crushed hand and amputated fingers, *see Leising v. Leemar Bldg. Co.,* No. H–91254 (Sup.Ct.Erie County June 1990) (LPR Pub. No. 62473); $390,000 for amputation of fingers, *see Young v. Conrail,* No. 22546–81 (Sup.Ct.N.Y.County 1987) (reported in ATLA Abstracts); $135,000 for amputated fingers, *see Rivera v. State of New York,* No. 63361 (Rochester County Ct. of Cl. Sept. 27, 1985) (reported in ATLA Abstracts).

In light of these verdicts, the award of $5,000,000 to Koerner for the injuries he sustained as a result of the accident on October 14, 1987 shocks the judicial conscience of this Court and must be set aside. Therefore, Club Med is entitled to a new trial on the issue of damages, and its Rule 59 motion is granted.

## III. *Club Med Is Entitled To A New Trial, Unless Koerner Agrees To A Remittitur Of The Damages Awarded*

Club Med is entitled to a new trial on the issues of negligence and damages, unless Koerner agrees to a remittitur of the damages award that is calculated upon an appropriate discount rate and an appropriate factor for Koerner's contributory negligence.

### A. *The Legal Standard For Remittitur*

Remittitur is employed when a damage award "is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, al-

though the surplus cannot be ascribed to a particular, quantifiable error." *Shu–Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir.1984). Thus, in an action in which the jury award is "shocking to the judicial conscience," remittitur is appropriate. This procedure gives the plaintiff the choice of submitting to a new trial on the identified issues or accepting a reduced amount of damages set by the court. *See Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1328–29 (2d Cir.1990); *Ismail,* 899 F.2d at 186; *Shu–Tao Lin,* 742 F.2d at 49.

A New York district court sitting in diversity may look to other jury awards condoned or remitted by the courts of New York State to determine the appropriate amount of the remittitur. *See Martell,* 748 F.2d at 750; *see also Adrat v. Mt. Sinai Hospital,* 110 A.D.2d 599, 488 N.Y.S.2d 613 (1st Dep't 1985); *Heyer v. New York,* 109 A.D.2d 662, 487 N.Y.S.2d 537 (1st Dep't 1985); *Thornton v. Montefiore Hosp.,* 99 A.D.2d 1024, 473 N.Y.S.2d 758 (1st Dep't 1984); *Griffith v. City of New York,* 99 A.D.2d 692, 471 N.Y.S.2d 537 (1st Dep't 1984).

### B. *Applying The Standards To The Jury's Verdict*

The matter at hand falls into that category of cases in which "a properly instructed jury hearing properly admitted evidence nevertheless [made] an excessive award." *Shu–Tao Lin,* 742 F.2d at 50. In light of the previous finding that the $5,000,000 award to Koerner was excessive, Club Med's motion for remittitur is an appropriate alternative to a new trial. The verdicts discussed above are useful in assisting the Court to determine an appropriate damages award, particularly the second set of verdicts discussed above which were held to be excessive by the respective courts. In those decisions, the courts gave the plaintiffs the choice of accepting a remittitur of the damages awarded or a new trial. *See Flynn,* 94 A.D.2d at 617, 462 N.Y.S.2d at 17 ($1,500,000 reduced to $850,000); *Berry,* 173 A.D.2d at 670, 570 N.Y.S.2d at 586 ($1,200,000 reduced to $100,000); *Prata,* 70 A.D.2d at 114, 420 N.Y.S.2d at 276 ($1,250,000 reduced to $700,000); *Osborne,* 38 A.D.2d at 298, 328

N.Y.S.2d at 769 ($800,000 reduced to $300,-000).[4]

When Koerner's injuries of 40% permanent partial disability to his right dominant hand, 10% permanent partial disability to his whole body as a consequence of the skin graft, and the psychological trauma of his disfigurement are considered within the context of the various jury verdicts discussed above, this Court finds that an award of $200,000 for past damages and $200,000 for future damages is appropriate. The future damages portion of the award must be discounted to present value. *See Oliveri v. Delta S.S. Lines, Inc.,* 849 F.2d 742, 745–46 (2d Cir.1988). When appropriately reduced by a discount rate of 2%, *see McCrann v. United States Lines, Inc.,* 803 F.2d 771, 775 (2d Cir.1986); *Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30, 40 (2d Cir. 1980), *cert. denied sub nom. Pittston Stevedoring Corp. v. Doca,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981), and calculated on the assumption of a payout in annual installments over the remaining 45.3 years of Koerner's expected life span, the award for future damages is $131,067. Thus the appropriate damages award is $331,067.

This damages award must be adjusted further to reflect this Court's finding that, on the trial record, Koerner was contributorily negligent in the amount of 25%. Thus the total damages amount to be awarded on Club Med's motion for remittitur is $248,300.25, which is based on a contributory negligence factor of 25%.

## IV. *Koerner's Rule 15(b) Motion Is Denied*

In light of the disposition of Club Med's present motions, Koerner's motion for leave to increase the *ad damnum* clause of the complaint is unwarranted and is denied.

### *Conclusion*

For the reasons set forth above, Club Med's Rule 50(b) motion is denied, its Rule 59 motion is granted, and Koerner's Rule 15(b) motion is denied. Unless Koerner agrees to a remittitur of the damages awarded and accepts a total damages award in the

4. *See supra* note 2.

amount of $248,300.25, Club Med is entitled to a new trial on all issues.

It is so ordered.